# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

GREGORY LEE VARNER,                             Case No. 1:15-cv-476
    Plaintiff,                              Barrett, J.
                                                    Litkovitz, M.J.

    vs.

COMMISSIONER OF                                 **REPORT AND**
SOCIAL SECURITY,                                **RECOMMENDATION**
    Defendant.

Plaintiff Gregory Lee Varner brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI").  This matter is before the Court on plaintiff's statement of

errors (Doc. 14) and the Commissioner's memorandum in opposition (Doc. 19).

## I.  Procedural Background

Plaintiff filed his applications for DIB and SSI in May and December 2011, respectively,

alleging disability since May 25, 2011[1] due to a groin injury, high blood pressure, a liver

problem, and vision problems.  The applications were denied initially and upon reconsideration.

Plaintiff requested and was granted a hearing before administrative law judge ("ALJ") Ena

Weathers.  Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing, at

which plaintiff was represented by a non-attorney representative.  On February 26, 2014, the

ALJ issued a decision denying plaintiff's DIB and SSI applications.  Plaintiff's request for

review by the Appeals Council was denied, making the ALJ's February 26, 2014 decision the

final administrative decision of the Commissioner.

---

[1] Plaintiff initially alleged disability since November 30, 2008, but later amended the alleged onset date to May 25, 2011.  (Tr. 13).

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2013.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since May 25, 2011, the amended alleged onset date of disability (20 CFR 404.1571-1576 and 416.971-976).
>
> 3. The [plaintiff] has the following severe impairments: history of hernia repair with residual groin pain; osteoarthritis with knee and low back pain; mild cataracts; depressive disorder; borderline intellectual functioning; and polysubstance abuse (alcohol and cannabis) (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the [plaintiff] has the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the [plaintiff] is unable to climb ladders, ropes, and scaffolds; and can occasionally crawl and climb ramps or stairs. The [plaintiff] is limited to simple, routine, and repetitive tasks without strict production demands. The [plaintiff] can perform occasional overhead reaching, especially on the right, and occasionally push/pull with the left lower extremity. The [plaintiff] requires verbal or demonstration instruction reminders with introduction of new tasks. The [plaintiff] must avoid concentrated exposure to hazards, including work at unprotected heights, commercial driving, and moving machinery. The [plaintiff] requires the use of a cane for ambulation on uneven surfaces.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. The [plaintiff] was born [in] 1959 and was 49 years old, which is defined as an individual closely approaching advanced age, on May 25, 2011, the amended alleged onset date of disability (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from May 25, 2011, the amended alleged onset date of disability, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-27).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,

478 F.3d 742, 745-46 (6th Cir. 2007).

---

[2] Plaintiff's past relevant work was as a furnace operator, a medium exertion, skilled position; a foundry steel worker, a heavy exertion, unskilled position; a shipping and receiving clerk, a medium exertion, skilled position; a roofer, a very heavy exertion, unskilled position; a foundry machine operator, a heavy exertion, unskilled position; and a construction laborer, a very heavy exertion, unskilled position. (Tr. 26, 61).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative occupations such as a light cleaner (227,471 jobs nationally), a packer (32,419 jobs nationally), and a food preparer (140,521 jobs nationally). (Tr. 27, 63).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

*Dr. Alsamman*

Plaintiff first saw internist Samer Alsamman, M.D., on September 4, 2012. (Tr. 516). Plaintiff complained of continuous right knee pain that caused a limp, left groin and hip pain related to a 2005 hernia repair surgery, and chronic back and abdominal pain. (*Id.*). Plaintiff was taking meloxicam (a nonsteroidal anti-inflammatory drug) and Lyrica (used to treat neuropathic pain). (Tr. 517). On physical examination, Dr. Alsamman noted abdominal tenderness in the right upper quadrant and paraumbilical area; right knee tenderness on active and passive movement with no crepitus, effusion, or restricted range of motion; and left hip pain

on movement. (Tr. 518). Dr. Alsamman ordered X-rays and provided a referral to physical therapy. (*Id.*).

On September 20, 2012, Dr. Alsamman's physical examination revealed abdominal tenderness in the right upper quadrant; left groin tenderness; right knee tenderness on active and passive movement with no crepitus, effusion, or restricted range of motion; and left hip pain on movement. (Tr. 515). Dr. Alsamman prescribed a knee brace and cane for the osteoarthritis in plaintiff's knee. (*Id.*).

An X-ray of plaintiff's knee in October 2012 revealed "mild medial compartmental joint space narrowing" with no soft tissue abnormalities. (Tr. 556). An October 2012 X-ray of plaintiff's hip revealed a synovial herniation pit in the right femoral neck. (Tr. 559). The radiologist recommended "[c]orrelation for femoral acetabular impingement syndrome." (*Id.*). The results of an October 2012 ultrasound of plaintiff's abdomen were normal except for a cyst on plaintiff's liver that appeared benign. (Tr. 552).

In November 2012, Dr. Alsamman noted that "[a]n orthopedic referral was requested for [plaintiff] based on the finding of hip joint synovial fluid herniation and suspected acetabular impingement." (Tr. 509). Physical examination revealed mild abdominal tenderness in the right hypochondrial area, left inguinal area tenderness, and decreased range of motion and bony tenderness in the right knee. (Tr. 511). Dr. Alsamman noted that plaintiff needed to return to his pain medicine physician and referred him to physical therapy. (Tr. 512).

In January 2013, an X-ray of plaintiff's knee showed mild medial compartment narrowing, "likely degenerative," that was unchanged from the October 2012 study. (Tr. 548). Also in January 2013, plaintiff rated his pain at 7 out of 10 for Dr. Alsamman. (Tr. 498). Dr. Alsamman noted that plaintiff did not go to his orthopedic appointment for the referral related to left hip synovial herniation. (*Id.*). On physical examination, Dr. Alsamman noted that the right

inguinal area was "small, firm, swelling, slightly enlarge[d] with cough, with mild tenderness to deep palpation." (Tr. 500). Dr. Alsamman also noted right knee tenderness with no effusion or swelling and pain and tenderness at the back of the lower part of the thigh and the back of the knee with no mass or swelling. (*Id.*). Dr. Alsamman ordered an abdominal ultrasound to determine if plaintiff had a right inguinal hernia. (Tr. 501). Dr. Alsamman prescribed ibuprofen for plaintiff's knee pain and indicated he would consider ordering a knee MRI if the pain persisted. (*Id.*).

A February 2013 abdominal ultrasound was normal and showed that the liver lesion noted in October 2012 was no longer present. (Tr. 544). In May 2013, plaintiff reported symptoms of depression and anxiety, for which Dr. Alsamman prescribed Paxil. (Tr. 493, 496). On physical examination, Dr. Alsamman noted tenderness in the left groin area related to the 2005 hernia repair surgery and tenderness and decreased range of motion in the right knee. (Tr. 495). Dr. Alsamman prescribed Bentyl (used to relieve muscle spasms and cramping in the gastrointestinal tract) for plaintiff's continued complaints of abdominal pain. (Tr. 496). Dr. Alsamman prescribed Naprosyn (a nonsteroidal anti-inflammatory drug) for plaintiff's knee pain. (*Id.*).

In August 2013, Dr. Alsamman noted that plaintiff was taking Naprosyn and Lyrica with "partial relief" of his knee pain. (Tr. 489). Dr. Alsamman indicated that plaintiff's chronic groin pain was "controlled" with Bentyl. (*Id.*). Physical examination revealed tenderness in both knees. (Tr. 491). Dr. Alsamman ordered intraarticular steroid injections for plaintiff's knees. (Tr. 492).

In September 2013, Dr. Alsamman noted that plaintiff had fallen "over the stairs after his right knee gave away, and he injured his face, and limbs." (Tr. 485). On physical examination, Dr. Alsamman noted chronic back pain and generalized tenderness over plaintiff's hands and

knees. (Tr. 487). Dr. Alsamman prescribed Vicodin, Naprosyn, and a handicapped parking permit for the osteoarthritis in plaintiff's knees. (Tr. 488). Dr. Alsamman advised plaintiff that he needed a home care nurse, "but he refused and his wife said she will take care of him[] at home." (*Id.*). Dr. Alsamman also advised plaintiff not to take stairs without assistance. (*Id.*). Dr. Alsamman administered a steroid injection in plaintiff's right knee. (Tr. 484).

Also in September 2013, plaintiff underwent a CT scan of the cervical spine after his fall. (Tr. 537). The CT scan revealed the following abnormal findings: (1) a "[p]osterior disc bulge narrows the ventral [cerebrospinal fluid] space" at C4-5; (2) anterior endplate spurs at C4-5; (3) disc narrowing at C5-6, including a "[d]isc bulge and endplate spurs [that] narrow the ventral [cerebrospinal fluid] space" and "left hypertrophic facet arthropathy" (i.e., facet syndrome); (4) a small anterior endplate spur at C6-7; and (5) reversal of normal curvature in the cervical spine. (Tr. 537).

In October 2013, plaintiff complained to Dr. Alsamman of right shoulder pain because of the fall in addition to his chronic pain complaints. (Tr. 480). On physical examination, Dr. Alsamman noted chronic left groin pain, right shoulder tenderness with decreased range of motion, and tenderness in both knees. (Tr. 482). Dr. Alsamman referred plaintiff to an orthopedic surgeon to assess the possibility of bilateral knee replacement. (Tr. 483). Dr. Alsamman ordered blood tests to rule out rheumatoid arthritis. Noting that plaintiff "has limited shoulder movement above the horizontal level with tenderness" and pain that did not resolve with medicines and physical therapy, Dr. Alsamman ordered an MRI of plaintiff's right shoulder. (*Id.*). The shoulder MRI revealed the following abnormal findings: (1) "supraspinatus and infraspinatus tendinopathy but no evidence of rotator cuff tear"; (2) a "small amount of fluid in subacromial-subdeltoid bursa suggestive of bursitis"; and (3) moderate osteoarthritis of the acromioclavicular joint. (Tr. 532).

8

In January 2014, Dr. Alsamman submitted an opinion concerning plaintiff's physical RFC. (Tr. 332-36). Dr. Alsamman noted diagnoses of generalized osteoarthritis and hypertension. (Tr. 332). As to prognosis, Dr. Alsamman commented: "limiting his functionality, progressive." (*Id.*). Dr. Alsamman listed the following symptoms: bilateral knee pain, stiffness in the knees and hands, frequent falls because knees give out, and chronic groin pain because of an old hernia repair. Dr. Alsamman opined that plaintiff's pain was continuous and his knee pain limited his mobility. Dr. Alsamman noted the following clinical findings and objective signs concerning plaintiff's knees: tenderness, loss of joint space, crepitus. (*Id.*). Dr. Alsamman indicated that medication, physical therapy, and knee support had all been tried with partial relief. (Tr. 333). Dr. Alsamman opined that "with progression of disease, these measures are not helpful." (*Id.*). Dr. Alsamman indicated that "stress from pain" was a psychological condition affecting plaintiff's physical condition. (*Id.*). Dr. Alsamman opined that plaintiff's experience of pain would "frequently" interfere with the attention and concentration needed to perform even simple work tasks. (*Id.*). Further, Dr. Alsamman opined that plaintiff was incapable of even "low stress" jobs due to "sever[e] progressive osteoarthritis, affecting knees and small joints of hands." (*Id.*). Dr. Alsamman did not complete three additional pages of questions concerning plaintiff's functional limitations. (*See* Tr. 334-36).

### *Dr. Hughes*

Neurologist Arthur Hughes, M.D., evaluated plaintiff in July 2013 for workers' compensation purposes. (Tr. 429-31). On physical examination, Dr. Hughes noted that plaintiff had a "markedly antalgic gait using a cane on the right." (Tr. 429). Further, plaintiff showed tenderness of the left groin and medial thigh; pain with flexion of the left leg at the hip and with internal and external rotation of the hip; and 1+ knee reflexes. Dr. Hughes observed that plaintiff's "movements were all made very deliberately due to pain." (*Id.*). Dr. Hughes opined

that plaintiff "has had persisting and increased left groin pain, which has severely limited his activities such that he is unable to use stairs, can walk only short distances, and has limited ability to lift. He has to use a cane because of the [e]ffect of the pain on his gait." (Tr. 430). Dr. Hughes opined that plaintiff's left ilioinguinal neuralgia and gait disorder combined for "a total permanent partial impairment of the whole person of 22%." (*Id.*). Dr. Hughes opined that a previous award of 11% "adds an additional 11% whole person permanent partial impairment." (*Id.*).

### Dr. Swedberg

Family medicine doctor Phillip Swedberg, M.D., examined plaintiff in April 2012 for disability purposes. (Tr. 383-90). On physical examination, Dr. Swedberg noted that plaintiff "ambulates with an antalgic somewhat stiff gait" and "appears to be in discomfort." (Tr. 389). Plaintiff had tenderness to palpation over the left groin and inguinal region. Plaintiff was unable to squat or walk heel to toe and he "had decreased range of motion of the lumbosacral spine with flexion 60 degrees, extension 20 degrees, right and left lateral flexion 20 degrees." (*Id.*). The rest of plaintiff's physical examination was within normal limits with no evidence of recurrent hernia. (Tr. 390). Dr. Swedberg opined that plaintiff "appears capable of performing a mild-to-moderate amount of sitting, standing, ambulating, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." (*Id.*). Further, Dr. Swedberg indicated that plaintiff "had no difficulty reaching, grasping or handling objects." (*Id.*).

### Dr. Griffiths

Clinical psychologist Brian Griffiths, Psy.D., examined plaintiff in January 2012 for disability purposes. (Tr. 344-50). Plaintiff reported consuming six cans of beer a day. (Tr. 346). He reported no prior mental health treatment. (*Id.*). Plaintiff reported the following activities of daily living: (1) watching television; (2) playing computer games; (3) spending time with his

girlfriend and grandchildren; (4) occasionally babysitting nieces and nephews; (5) attending to his own grooming and hygiene; and (6) doing "light household chores with frequent breaks like wiping off the kitchen table" because he was unable to stand for long periods of time. (Tr. 347). Further, plaintiff reported that he was able to fix a meal but could not go grocery shopping because it required too much walking. (*Id.*).

On clinical examination, Dr. Griffiths noted that plaintiff's "phraseology, grammatical structure, and vocabulary suggested that he is an intellectually limited person." (*Id.*). He was unable to perform serial sevens and committed multiple errors counting backwards from twenty by threes. (Tr. 348). Plaintiff was unable to perform a verbal mathematics problem involving division. Plaintiff received a full scale IQ score of 65 on the Wechsler Adult Intelligence Scale, Fourth Edition, "indicating that he is currently functioning in the mildly mentally retarded range of intelligence or at about the 1st percentile for his age group." (*Id.*). His working memory score of 71 indicated "that his attention and concentration skills fall in the borderline range or at about the 3rd percentile for his age group." (*Id.*). His processing speed score of 50 indicated "that his processing speed falls in the deficient range or at less than the 1st percentile for his age group." (*Id.*). Dr. Griffiths opined that plaintiff's performance on the IQ test was "somewhat lower than would be expected based on his clinical presentation" and "emotional factors and/or vision problems negatively impacted his performance on this measure as he appears to be of borderline intelligence." (*Id.*).

Dr. Griffiths diagnosed plaintiff with depressive disorder, alcohol abuse, and borderline intellectual functioning. (Tr. 349). Dr. Griffiths noted that plaintiff "performed poorly on Digit Span, a simple structured task designed to assess short-term memory skills." (*Id.*). Dr. Griffiths opined that this might "suggest problems remembering and carrying out basic work-related activities in a timely and consistent manner." (Tr. 350). Further, Dr. Griffiths opined that

plaintiff "may have difficulty understanding simple work-related instructions if they are presented to him in a written format." (*Id.*). As to plaintiff's ability to maintain attention, concentration, persistence, and pace, Dr. Griffiths opined: "Problems with sustained attention and concentration are expected. In addition, the limited energy, easy fatigability and poor frustration tolerance that often accompanies depression may interfere with task persistence and pace." (*Id.*). As to plaintiff's ability to interact with others, Dr. Griffiths opined that plaintiff's "emotional difficulties may cause him to withdraw from others." (*Id.*). Finally, as to plaintiff's ability to respond appropriately to work pressures, Dr. Griffiths opined that "in light of his current mental state, the stress and pressures associated with day-to-day work activity might exacerbate depressive symptomology leading to withdrawal and slowed work performance." (*Id.*).

### Non-examining State Reviewing Physicians

In May 2012, Maureen Gallagher, D.O., and Carl Tishler, Ph.D., examined medical records from Dr. Swedberg, Dr. Griffiths, and Faculty Medical Center. (Tr. 68-82). Dr. Gallagher opined that plaintiff's physical RFC was limited in the following ways: (1) occasionally lift 50 pounds; (2) frequently lift 25 pounds; (3) stand and/or walk for 6 hours in an 8-hour workday; (4) sit for 6 hours in an 8-hour workday; (5) frequently climb ramps/stairs; (6) occasionally climb ladders/ropes/scaffolds; and (7) frequently crawl. (Tr. 77-78). Dr. Tishler opined that plaintiff's mental RFC was limited in the following ways: (1) marked limitation in the ability to understand and remember detailed instructions; (2) marked limitation in the ability to carry out detailed instructions; (3) moderate limitation in the ability to complete a normal workday without interruptions from psychological symptoms and to perform at a consistent pace; (4) moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors; and (5) moderate limitation in the ability to respond appropriately to changes

in the work setting. (Tr. 78-80). On reconsideration in August 2012, Leslie Green, M.D., and Vicki Warren, Ph.D., reached the same conclusions. (*See* Tr. 107-11).

### E. Specific Errors

On appeal, plaintiff argues the ALJ failed to properly assess plaintiff's mental limitations and pain in formulating the RFC. Next, plaintiff argues the ALJ failed to properly weigh the medical opinions of record and improperly substituted her own non-medical judgment. (Doc. 14). Because the ALJ's assessment of the medical opinions directly impacts whether the ALJ properly formulated plaintiff's RFC, the Court will first consider plaintiff's assignment of error related to the ALJ's consideration of the medical opinions.

1. **Whether substantial evidence supports the ALJ's consideration of the medical opinions of record.**

   a. *Substantial evidence supports the ALJ's assessment of the treating physician's opinion.*

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 at *5 (1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

The ALJ gave little weight to Dr. Alsamman's opinion for the following reasons: (1) it was neither well supported nor consistent with the substantial evidence of record; (2) the degree of pain opined by Dr. Alsamman was not supported by objective findings or plaintiff's treatment history; (3) the degree of pain was not consistent with plaintiff's activities of daily living; and (4) the limitations opined by Dr. Alsamman are mental functional impairments, but he does not have a psychological or mental health specialty. (Tr. 24).

Plaintiff contends the ALJ improperly rejected Dr. Alsamman's opinion because plaintiff's treatment records and objective radiological evidence support that opinion. (Doc. 14 at 14).

Here, the ALJ properly weighed Dr. Alsamman's opinions. First, the ALJ gave good reasons for not giving Dr. Alsamman's opinion controlling weight and those reasons are substantially supported by the record. Dr. Alsamman did not complete three of the five pages of the questionnaire. (*See* Tr. 334-36). In the two pages that Dr. Alsamman did complete, the only functional limitations he identified were that plaintiff's pain would frequently interfere with the attention and concentration needed to perform even simple work tasks and plaintiff would be incapable of even "low stress" jobs. (Tr. 333). In discounting Dr. Alsamman's opinion on plaintiff's mental RFC, the ALJ properly considered the fact that Dr. Alsamman was not a specialist in mental health treatment. *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). The ALJ also reasonably concluded that Dr. Alsamman's opinion was "internally inconsistent" inasmuch as Dr. Alsamman opined that plaintiff's pain was severe enough to cause problems with attention, concentration, and the ability to handle work stress, but Dr. Alsamman did not indicate that plaintiff's pain would cause any exertional or postural limitations. (Tr. 24); *see Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442 (6th Cir. 2010) (holding that internal

15

inconsistencies in a treating physician's opinion may provide substantial evidentiary support for the ALJ's decision not to accord it controlling weight).

Moreover, substantial evidence supports the ALJ's determination that Dr. Alsamman's opinion concerning the severity of plaintiff's pain was not supported by objective findings or plaintiff's treatment history. (Tr. 24). As the ALJ noted, plaintiff's April 2012 physical examination with Dr. Swedberg was within normal limits except for an antalgic gait, decreased range of motion of the lumbosacral spine, and tenderness over the groin region. (*See* Tr. 21, 390). Further, the ALJ referenced an examination in January 2012 by pain management doctor Gregory Fry, M.D., that was unremarkable except for "only some non-specific tenderness over the left groin." (*See* Tr. 21, 459). Dr. Fry noted that plaintiff's sensory and motor functions remained intact in all extremities. (*See id.*). The ALJ also properly noted that radiological studies revealed only mild changes that do not support plaintiff's complaints of severe pain. (*See* Tr. 21-22). For example, an October 2012 ultrasound of plaintiff's abdomen was normal except for a benign cyst on plaintiff's liver. (Tr. 552). An October 2012 knee X-ray revealed only "mild medial compartmental joint space narrowing" with no soft tissue abnormalities. (Tr. 556). A January 2013 X-ray of plaintiff's knee was unchanged. (Tr. 548). While Dr. Alsamman referred plaintiff to an orthopedist based on an October 2012 hip X-ray that showed "hip joint synovial fluid herniation and suspected acetabular impingement," plaintiff did not go to his orthopedic appointment. (*See* Tr. 498, 509, 559). During the following year of treatment, Dr. Alsamman never noted any abnormal findings on physical examination related to plaintiff's hip. (*See* Tr. 482, 487, 491, 495, 500). As to plaintiff's cervical spine, the ALJ accurately noted that a September 2013 CT scan showed only "some low-grade degenerative disc disease/spondylosis." (*See* Tr. 22, 537). An October 2013 shoulder MRI revealed some tendinopathy, bursitis, and moderate osteoarthritis, but no evidence of rotator cuff tear. (*See* Tr.

22, 532).  The ALJ also reasonably noted that plaintiff's conservative pain treatment did not

support Dr. Alsamman's opinion.  (*See* Tr. 22, 24); *see Francis v. Comm'r Soc. Sec. Admin.*, 414

F. App'x 802, 806 (6th Cir. 2011) ("[T]he ALJ reasonably viewed Francis's limited treatment as

inconsistent with Dr. Wakham's opinion.  While Francis has been no stranger to a doctor's

office, all of his recent treatments were conservative and largely confined to pain

medications. . . .  [This is] consistent with a finding that Francis's medications adequately

manage his pain and enable him to work full time with some restrictions.  This, again, is all that

the substantial-evidence standard requires.").

  For these reasons, the Court determines that the ALJ reasonably declined to give Dr.

Alsamman's opinion controlling weight.  *See Gayheart*, 710 F.3d at 376.

  Moreover, substantial evidence supports the ALJ's weighing of the regulatory factors in

affording little weight to Dr. Alsamman's opinion.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6),

416.927(c)(2)-(6).  In her decision, the ALJ noted that she considered "all of the relevant factors,

including the doctor's specialization, the doctor's explanation for the opinion, and the

consistency of the opinion with the record [as] a whole (20 CFR 404.1527)."  (Tr. 24).  As

already explained, the reasons the ALJ gave in support of discounting Dr. Alsamman's opinion

were good reasons.  Further, these reasons "reache[d] several of the factors that an ALJ must

consider."  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).  For example, the

ALJ noted that Dr. Alsamman was not a specialist in psychiatry or mental health treatment in

discounting Dr. Alsamman's opinion on plaintiff's mental health limitations.  *See* 20 C.F.R. §§

404.1527(c)(5), 416.927(c)(5).  Further, the ALJ's comments concerning the internal

inconsistency of Dr. Alsamman's opinion and the lack of objective findings and treatment

history to support his opinion address the regulatory factors of supportability and consistency.

*See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).  Thus, the ALJ stated good reasons for

discounting Dr. Alsamman's opinion that are consistent with the regulatory factors the ALJ must consider. Accordingly, substantial evidence supports the ALJ's assessment of Dr. Alsamman's opinion.

> b. *Substantial evidence supports the ALJ's assessment of Dr. Hughes's opinion.*

"[O]pinions from nontreating . . . sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. "The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Id.* (citing 20 C.F.R. § 404.1527(c)). "Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id.* (quoting 20 C.F.R. § 404.1527(c)(6)).

The ALJ gave little weight to Dr. Hughes's opinion for the following reasons: (1) Dr. Hughes rendered his opinion for workers' compensation purposes and "a determination of disability by another agency is not binding on [the Social Security Administration]; and (2) Dr. Hughes's opinion concerning plaintiff's limitations was "inconsistent with, and not supported by, [plaintiff's] activities of daily living, treatment history, and objective physical examination findings." (Tr. 24-25).

Plaintiff argues the ALJ improperly rejected Dr. Hughes's opinion because even though that opinion was rendered for workers' compensation purposes, it was "still based on his physical examination" and review of plaintiff's medical records. (Doc. 14 at 14-15).

Here, substantial evidence supports the ALJ's assessment of Dr. Hughes's opinion. The ALJ gave two reasons for giving little weight to Dr. Hughes's opinion. The first reason—that Dr. Hughes rendered his opinion for workers' compensation, which has different standards for disability than the Social Security Administration—is not compelling. (*See* Tr. 24). Specifically, while this would be a legitimate reason for the ALJ to reject Dr. Hughes's opinion

that plaintiff's left ilioinguinal neuralgia and gait disorder combined for "a total permanent partial impairment of the whole person of 22%," the mere fact that Dr. Hughes rendered his opinion for workers' compensation purposes is not a valid reason to discredit his opinion that plaintiff's medical conditions resulted in restrictions in using stairs, walking, and lifting. (Tr. 430).

However, the ALJ also found that Dr. Hughes's opinion lacked consistency and supportability and these are reasonable grounds supported by substantial evidence for giving Dr. Hughes's opinion little weight under the regulatory factors. (Tr. 25). The evidence described above in connection with the ALJ's weighing of Dr. Alsamman's opinion likewise supports the ALJ's determination that Dr. Hughes's opinion was inconsistent with and not supported by plaintiff's treatment history and objective physical examination findings. (*Id.*). Further, as to Dr. Hughes's own examination findings, he noted only that plaintiff had an antalgic gait, tenderness of the left groin and medial thigh, pain with flexion of the left leg at the hip and with rotation of the hip, and deliberate movements due to pain. (Tr. 429). Dr. Hughes did not explain how any of these findings translated to a complete inability to use stairs, an ability to walk only short distances, and a limited ability to lift. (*See* Tr. 429-30). Thus, the ALJ reasonably weighed several relevant regulatory factors in discounting Dr. Hughes's opinion. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4). Accordingly, substantial evidence supports the ALJ's assessment of Dr. Hughes's opinion.

> c. *Substantial evidence does not support the ALJ's assessment of Dr. Griffiths' opinion.*

The ALJ summarized the findings of consultative psychologist Dr. Griffiths, but did not indicate how much weight, if any, she was giving to Dr. Griffiths' opinion. (*See* Tr. 23-24). Specifically, the ALJ stated the following concerning Dr. Griffiths' opinion:

> [T]he psychological consultative examiner opined that [plaintiff] appeared to be an intellectually limited man; however, he was able to follow simple verbal instructions during the evaluation.  However, the doctor indicated that [plaintiff] may have problems remembering and carrying out basic work-related activities in a timely and consistent manner, as well as having difficulty understanding simple work-related instructions if they are presented to him in a written format.  In addition, the doctor opined that problems with sustained attention and concentration are expected; limited energy, easy fatigability and poor frustration tolerance may interfere with task persistence and pace; and he has no history or reports of social difficulties, but his emotional difficulties may cause him to withdraw from others.  The doctor also noted that [plaintiff] has no history of decompensation from exposure to the workplace; however, in light of his current mental state, the stress and pressure associated with day-to-day work activity might exacerbate depressive symptomatology leading to withdrawal and slowed work performance.  The doctor also assigned a Global Assessment of Functioning [score of] 55, which is indicative of only "moderate" symptoms and "moderate" difficulties in social or occupational functioning[.]

(Tr. 23-24).

Plaintiff argues the ALJ's RFC failed to account for the mental limitations that consultative psychologist Dr. Griffiths identified.  (Doc. 14 at 9-10).  Plaintiff also contends the ALJ erred by not reporting how much weight she gave to Dr. Griffiths' opinion.  (*Id.* at 15-16).

Here, the ALJ recited Dr. Griffiths' findings but did not indicate how much weight, if any, she was giving to his opinion.  (*See* Tr. 23-24).  Thus, the ALJ failed to provide any indication that she had weighed Dr. Griffiths' opinion as required under the regulatory factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  *See also Gayheart*, 710 F.3d at 379 (remanding because among other errors, "[t]he ALJ's decision provides no indication that he applied the factors set out in § 404.1527(c)—supportability, consistency, specialization—when weighing the consultative doctors' opinions").  The ALJ's decision is devoid of any reasoning related to Dr. Griffiths' opinion and the Court cannot discern which findings the ALJ accepted, which findings she rejected, and her reasons for accepting or rejecting those findings.  Thus, the Court is unable to determine whether substantial evidence supports the ALJ's mental RFC findings because the Court has no way to determine how much weight the ALJ actually gave to Dr. Griffiths' opinion.

20

The failure of the ALJ to properly assess Dr. Griffiths' opinion is especially troubling in this case because Dr. Griffiths performed the only complete mental health examination of plaintiff in the record.  Moreover, examining Dr. Griffiths' opinion in light of the regulatory factors strongly suggests that his opinion is consistent with and supported by Dr. Griffiths' own examination findings and the medical record.  *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).  For example, Dr. Alsamman prescribed Paxil for plaintiff's symptoms of depression and anxiety.  (Tr. 493, 496).  Dr. Alsamman opined that plaintiff's experience of pain would "frequently" interfere with the attention and concentration needed to perform even simple work tasks.  (Tr. 333).  Further, Dr. Alsamman opined that plaintiff was incapable of even "low stress" jobs.  (*Id.*).  While Dr. Alsamman is not a mental health specialist, he saw plaintiff frequently as his treating physician and the ALJ should have considered whether his opinion and treatment of plaintiff was consistent with and supported Dr. Griffiths' findings.

In deciding whether the ALJ's failure to consider the regulatory factors and assign weight to Dr. Griffiths' opinion warrants reversal, the Court must determine whether "that error prejudices [plaintiff] on the merits or deprives [him] of a substantial right."  *Rabbers*, 582 F.3d at 651.  The Commissioner argues that the ALJ's failure to indicate the amount of weight she gave Dr. Griffiths' opinion was harmless error because the ALJ's RFC assessment accounted for all the limitations that Dr. Griffiths identified.  (Doc. 19 at 14-15).  If the Commissioner is correct, then reversal would not be warranted because the ALJ's failure to identify the weight given to Dr. Griffiths' opinion would not have "prejudice[d] [plaintiff] on the merits or deprive[d] [him] of a substantial right."  *Rabbers*, 582 F.3d at 651.

Dr. Griffiths identified the following functional limitations as consistent with plaintiff's history, mental status examination, and IQ testing:  (1) problems remembering and carrying out basic work-related activities in a timely and consistent manner; (2) difficulty understanding

simple work-related instructions if they are presented in a written format; (3) problems with sustained attention and concentration; (4) interference with task persistence and pace from the limited energy, easy fatigability, and poor frustration tolerance that often accompany depression; (5) emotional difficulties that may cause plaintiff to withdraw from others; and (6) withdrawal and slowed work performance in light of plaintiff's current mental state and the stress and pressures associated with day-to-day work activity. (*See* Tr. 349-50). First, the ALJ accounted for plaintiff's difficulty understanding simple work-related instructions presented in a written format by requiring "verbal or demonstration instruction reminder with introduction of new tasks." (Tr. 19). Further, the RFC accounted for plaintiff's problems with sustained attention and concentration, task persistence, and pace by limiting plaintiff to "simple, routine, and repetitive tasks without strict production demands." (*Id.*). *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 635 (6th Cir. 2016) (rejecting plaintiff's argument that ALJ's hypothetical limiting plaintiff to simple, unskilled work in a low stress job was insufficient to convey moderate limitations in concentration, persistence, and pace); *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) ("[T]he limitation to simple, routine, and repetitive tasks adequately conveys [plaintiff's] moderately limited ability 'to maintain attention and concentration for extended periods.'").

However, it is not clear that the ALJ's RFC assessment accounted for Dr. Griffiths' findings that plaintiff would have problems remembering and carrying out basic work-related activities in a timely and consistent manner. (*See* Tr. 19, 350). While the ALJ limited plaintiff to simple tasks, the Court cannot say that the limitation to simple tasks adequately accommodates Dr. Griffiths' finding that plaintiff might have problems with even *basic* work activities. Further, the ALJ's RFC assessment did not include any limitations concerning plaintiff's ability to interact with supervisors, coworkers, or the general public to account for Dr.

22

Griffiths' findings related to plaintiff's expected withdrawal from others as a result of his emotional difficulties and response to work stress and pressures. (*See* Tr. 19, 350).

Accordingly, the Court finds that the ALJ's failure to properly weigh Dr. Griffiths' opinion does not constitute harmless error. Instead, this failure may have "prejudice[d] [plaintiff] on the merits or deprive[d] [him] of a substantial right," as the additional limitations that Dr. Griffiths identified that were not accounted for in plaintiff's RFC might alter the Commissioner's evaluation of whether there was other work that plaintiff could perform. *Rabbers*, 582 F.3d at 651. Therefore, plaintiff's third assignment of error should be sustained. At this time, the Court declines to consider plaintiff's first assignment of error concerning the mental limitations included in the RFC because a proper evaluation of Dr. Griffiths' opinion may change the ALJ's RFC assessment.

### 2.  Substantial evidence supports the ALJ's assessment of plaintiff's pain.

Subjective complaints of pain and other symptoms are evaluated under the standard set forth in *Duncan v. Sec'y of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. *Id.* at 853. If there is, the Commissioner must then determine:  (1) whether the objective medical evidence confirms the severity of the pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Id.*

In addition to the objective medical evidence, the Commissioner must consider the opinions and statements of the plaintiff's doctors. *Felisky*, 35 F.3d at 1040. Additional specific factors relevant to the plaintiff's allegations of pain include his daily activities; the location, duration, frequency, and intensity of his pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication plaintiff takes to alleviate his pain or

other symptoms; treatment other than medication plaintiff has received for relief of his pain; and any measures the plaintiff uses to relieve his pain. *Id.* at 1039-40; 20 C.F.R. § 404.1529(c). Although plaintiff is not required to provide "objective evidence of the pain itself" in order to establish he is disabled, *Duncan*, 801 F.2d at 853, statements about his pain or other symptoms are not sufficient to prove disability. 20 C.F.R. § 404.1529(a). The record must include "medical signs and laboratory findings which show that [plaintiff has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that [plaintiff is] disabled." *Id.*

The ALJ found that "the record does not support [plaintiff's] allegation that his impairments are so severe that they prevent him from working." (Tr. 21). As to plaintiff's groin pain, the ALJ determined that while Dr. Swedberg's examination revealed tenderness, "additional physical examinations of record were benign and continuously reflect that no expansile mass was seen with no evidence of recurrent inguinal hernia." (*Id.*). Further, the ALJ noted that plaintiff's "groin pain has not caused any changes in his bowel or urinary habits" and "no further surgery for his groin pain has been recommended." (*Id.*). While acknowledging that the record contains evidence of an antalgic gait, the ALJ stated that plaintiff's "physical examinations show normal strength, as well as sensory and motor functions intact in all four extremities with no deficits except for diminished sensation over the left groin area." (*Id.*). The ALJ also noted that the October 2012 knee X-ray "revealed only mild medial compartmental joint space narrowing, likely degenerative, and left hip x-rays reported synovial herniation in the right femoral neck with recommendation for correlation for femoral acetabular impingement syndrome recommended." (*Id.*). Further, the ALJ found that plaintiff's pain did not result in symptoms normally associated with chronic, severe pain such as muscle atrophy, rigidity, or

tremor. (*Id.*). The ALJ also noted that plaintiff "has conservatively treated for his pain with medications and injections, but he has not undergone any more invasive treatment such as further surgery." (Tr. 22). The ALJ concluded that the following RFC restrictions adequately accounted for plaintiff's groin pain and osteoarthritis with knee and low back pain: light work with only occasional overhead reach, push and pull, crawling, and climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; avoidance of concentrated exposure to hazards; and use of a cane for ambulation on uneven surfaces. (*Id.*).

Plaintiff argues the ALJ cherry-picked his medical records to discount his pain symptoms. (Doc. 14 at 11-12). Plaintiff contends the ALJ improperly relied on the lack of surgical intervention in discounting the severity of plaintiff's pain because "[n]o where in the records does a physician suggest a surgical procedure for the neuralgic [ilioinguinal pain]." (*Id.* at 12).

Here, radiological evidence confirms underlying medical conditions in plaintiff's knee, cervical spine, hip, and shoulder that could cause pain. (*See* Tr. 532, 537, 548, 556, 559); *see Duncan*, 801 F.2d at 853. However, substantial evidence supports the ALJ's finding that objective medical evidence does not confirm the severity of the pain alleged by plaintiff. (*See* Tr. 21-22); *see Duncan*, 801 F.2d at 853. Plaintiff is correct that the record does not reveal any medical recommendation that surgery was appropriate for his neuralgic ilioinguinal pain. (*See* Doc. 14 at 12). In fact, Dr. Fry noted that plaintiff obtained a surgical consultation related to his continuing ilioinguinal pain, but the surgeon did not "want to re-explore" the surgical site as there was no evidence that his hernia had recurred. (Tr. 452). Thus, as to plaintiff's continuing ilioinguinal pain, the ALJ unreasonably relied on the fact that he had not undergone surgery.

Nevertheless, the ALJ's finding that plaintiff "has conservatively treated for his pain with medications and injections, but . . . has not undergone any more invasive treatment such as

further surgery," was not limited to plaintiff's ilioinguinal pain and is substantially supported. (Tr. 22). For example, Dr. Alsamman referred plaintiff to an orthopedic surgeon to evaluate plaintiff's hip, but plaintiff did not go to his orthopedic appointment. (*See* Tr. 498, 509). Dr. Alsamman also referred plaintiff to an orthopedic surgeon to assess the possibility of bilateral knee replacement, but there is no evidence in the record that plaintiff made an appointment with an orthopedist for that condition either. (*See* Tr. 483). Further, plaintiff was referred to physical therapy, but "[h]e stopped physical therapy by himself." (Tr. 516). Dr. Fry treated plaintiff's pain symptoms with Lyrica and nonsteroidal anti-inflammatory drugs and refused to prescribe more powerful narcotic analgesics "under any circumstances for this poorly motivated patient." (Tr. 457). Thus, substantial evidence supports the ALJ's finding that plaintiff's pain treatment was conservative. This record of conservative treatment supports the ALJ's determination that plaintiff's pain was not disabling. *See Francis*, 414 F. App'x at 806.

Moreover, the ALJ noted the absence of most of the objective signs typically associated with severe pain such as muscle atrophy, rigidity, and tremor. (Tr. 21). The ALJ reasonably relied on the lack of objective findings in determining that plaintiff's allegations concerning the severity of his pain were not fully credible. *See Jones v. Sec'y, Health & Human Servs.*, 945 F.2d 1365, 1369-70 (6th Cir. 1991) (reliable objective evidence of pain includes medical evidence of muscle atrophy, reduced joint motion, muscle spasm, and sensory and motor disruption). Plaintiff argues that numerous findings of tenderness in the medical record constitute objective evidence of severe pain. (*See* Doc. 14 at 11-12). However, tenderness on physical examination is not the type of objective evidence on which courts generally rely in considering whether the alleged severity of a plaintiff's pain is substantially supported. *See, e.g., Wagoner v. Comm'r of Soc. Sec.*, No. 1:11-cv-543, 2012 WL 2711044, at *11 (S.D. Ohio Jul. 6, 2012) (Report and Recommendation) (Litkovitz, M.J.), *adopted* 2012 WL 3072315 (S.D. Ohio

Jul. 30, 2012) (Beckwith, J.) (finding that despite instances of tenderness to palpation in the medical record, substantial evidence supported the ALJ's finding that plaintiff's back pain was not disabling where there was no evidence of muscle atrophy, neurological defects, reduced joint motion, or sensory and motor disruption); *McDaniel v. Astrue*, No. 08-cv-61, 2008 WL 4758662, at *4 (E.D. Ky. Oct. 29, 2008) (finding that despite instances of tenderness to palpation in the medical record, substantial evidence supported the ALJ's finding that plaintiff's back pain was not disabling where there was no evidence of focal or neurological deficits).

For these reasons, substantial evidence supports the ALJ's finding that plaintiff's pain was not of disabling severity. Accordingly, plaintiff's second assignment of error should be overruled.

### III. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). This matter should be remanded for further proceedings, including consideration and reevaluation of the opinions of the mental health sources of record, reassessment of plaintiff's mental RFC, and additional vocational testimony as warranted, consistent with this decision.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: 6/27/16

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

GREGORY LEE VARNER,                          Case No. 1:15-cv-476
     Plaintiff,                             Barrett, J.
                                               Litkovitz, M.J.

     vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).